```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                           14 Cr. 160 (VEC)

FRANK DiTOMASSO,

                Defendant .

------------------------------x
                                         New York, N.Y.
                                         April 21, 2017
                                         3:30 p.m.


Before:

                HON. VALERIE E. CAPRONI,

                                         District Judge


                       APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  MARGARET GRAHAM
     KIMBERLY J. RAVENER
     PETER CALABRESE
     Assistant United States Attorney

COHEN & FUNK, P.C.
     Attorneys for Defendant
BY:  LORI COHEN
     ARTHUR K. WOMBLE, JR.
```

1          (Case called)

2          MS. GRAHAM:  Good afternoon, your Honor.  Margaret
3  Graham on behalf of the government, joined by AUSA Kimberly
4  Ravener and Peter Calabrese, who were also with me in trial.

5          THE COURT:  Good afternoon.

6          MS. COHEN:  Good afternoon, your Honor.  Lori Cohen.
7  With me is Ken Womble and my client, Mr. DiTomasso.

8          THE COURT:  Good afternoon.

9          Good afternoon, Mr. DiTomasso.

10         THE DEFENDANT:  Hello, your Honor.

11         THE COURT:  Okay.  Ms. Cohen, would you like to be
12  heard on your motion?

13         MS. COHEN:  Yes, Judge, just briefly.  We have fully
14  briefed the motion, as the Court's aware.

15         Let me just state at the outset, it's always difficult
16  to call another lawyer ineffective.  I mean, that's not a
17  popular stance.  I don't care about it being popular, but it is
18  uncomfortable.

19         So I do want to say that Mr. Ginsberg is an
20  experienced trial lawyer, and we're not alleging he is an
21  incompetent lawyer, but we are saying in the facts of this
22  case, what he did was ineffectively represent Mr. DiTomasso at
23  the trial.

24         The government has spent a lot of time in its brief
25  talking about what he did pretrial.  He certainly litigated

1    this case pretrial. There is no doubt about that. However,
2    it's our position that, once Robert Marcus came to him and
3    indicated to him that he was the real perpetrator in this
4    case -- and as another aside, we know that's why he -- what he
5    said because Mr. Ginsberg immediately called the government and
6    indicated he needed an attorney. So --
7           THE COURT: Well, that doesn't mean he confessed.
8           MS. COHEN: No, it does not. But I -- and I've
9    thought a lot about that, because I think that's a pivotal
10    point, really, in this entire process.
11           Clearly, Mr. Marcus said something to Mr. Ginsberg
12    that would have indicated Mr. Marcus required an attorney.
13           THE COURT: Right. But isn't part of the premise of
14    your argument that either Mr. Marcus is guilty or Mr. DiTomasso
15    is guilty, and it ignores the possibility that they're both
16    guilty?
17           MS. COHEN: I think our argument is that Mr. Marcus
18    saying that he was guilty would have changed the outcome of
19    Mr. DiTomasso's trial. I don't think we opine on whether
20    they're both guilty or not, and certainly that's something the
21    government can argue. But I think in a case like this, which
22    was substantially circumstantial --
23           THE COURT: It was an overwhelming circumstantial
24    case. I'm not sure it was all circumstantial. There was a
25    fair amount of direct evidence.

1          MS. COHEN:  I would say, your Honor, the only direct
2    evidence are the video chats.
3          THE COURT:  That would be the evidence I would be
4    talking of.
5          MS. COHEN:  That would be.  Mr. DiTomasso has
6    explained in his testimony how that video evidence could have
7    come into being.  But I think when -- you know, we're all --
8    we've all been lawyers for a long time, and when you're faced
9    with somebody telling you that they are the perpetrator of the
10   crime, which is what Mr. Marcus has said he told Mr. Ginsberg
11   on more than one occasion, and you are then faced with a trial
12   which is largely circumstantial -- they can tie the IP
13   addresses to a location, they can tie the email addresses to a
14   location -- when there are pieces of that circumstance that can
15   also point to another person, some of the IP addresses are to
16   an account that's in Mr. Marcus' name -- some of the National
17   Center for Children Report forms were, in fact, made about
18   Mr. Marcus -- when you have these pieces that can be turned
19   from all pointing at your client to pointing to another person
20   who has means and opportunity, and he's now telling you that he
21   might, in fact, have been culpable, is just is beyond, I think,
22   comprehension that he was not called as a witness when
23   available.  And that's basically the bottom line of our
24   argument.  Thank you.
25         THE COURT:  All right.  Thank you, Ms. Cohen.

C4SODIT4

1           Ms. Graham.

2           MS. GRAHAM:  Your Honor, as you noted, our main point
3  is that the evidence was overwhelming against Mr. DiTomasso,
4  both circumstantial and very important direct evidence.  I
5  mean, it's rare that you actually have images of the defendant
6  committing the offense, and that is, in fact, exactly what we
7  had here, what we showed the jury, and what we provided in
8  redacted form to your Honor.  Even if Mr. Marcus had testified,
9  it would not have made a difference in the outcome of the case.

10          But stepping back from that, I would submit that
11 Mr. Marcus' affidavit is, on its face, not credible, and your
12 Honor can determine without the need for a hearing to examine
13 his or Mr. Ginsberg's credibility.  Then, in fact, based on the
14 other evidence in the record, which we set forth before your
15 Honor, and I'm happy to answer any questions about, but I won't
16 belabor by repeating again here, that it's simply not credible
17 his claim that he confessed to Mr. Ginsberg multiple times and,
18 in fact, wanted to come forward.

19          Just to address two points that were recently made.
20 Mr. Ginsberg noted that he asked for an attorney for
21 Mr. Marcus, and we provided one, based upon hypothetical
22 statements that Mr. Marcus had made about what would happen if
23 he came forward, and this is consistent with the entire record
24 which shows Mr. Marcus toying with this idea, urged by the
25 defendant of coming forward, but ultimately deciding not to,

1   which you can see most clearly really in the February 17th call

2   that we've excerpted for you.  And I know that that's already

3   before your Honor.

4        One thing I wanted to point out that we maybe did not

5   make as clear in our brief is the timing of that call.  Our

6   final pretrial conference was on January 25th, 2016.  That was

7   a Monday.  Trial was scheduled to start the next Monday.  Now,

8   at that conference, Judge Scheindlin said -- and it's in the

9   transcript -- the defendant had asked to adjourn the trial for

10  many reasons, one of which was that his uncle might not be able

11  to attend, and Judge Scheindlin said -- and this is on page 5

12  of that transcript which is attached in our exhibits -- "His

13  final argument is that his uncle may not be available during

14  trial, but that can't be helped either.  He is not a necessary

15  witness.  I realize he's family support, but it is not as if

16  this is the key witness in the trial.  In no way has anybody

17  told me this is a key witness.  I can't say that's a basis for

18  adjournment."

19       And there was no argument by defendant at that point,

20  who had shown himself well able to address the Court sua sponte

21  on other occasions and in other conferences.  So that happens

22  on January 25th.

23       On February 1st, the next Monday, the trial is

24  scheduled to start, and everyone believes it will start until

25  Saturday morning there is a call between Judge Scheindlin and

1  counsel that, based on personal circumstances, the trial is
2  going to have to be adjourned.
3        This phone call between Mr. Marcus and the defendant,
4  where it is clear that Mr. Marcus is not in any way prepared to
5  testify, and in fact wants to come forward in a kind of what he
6  calls analogous to the Central Park jogger case, he wants to
7  come forward and confess after the trial.  So he is in no way
8  saying that he's ready to testify happened on February 17th.
9  That's 16 days after trial was supposed to have begun, which
10  again shows that, based on the record before you, without the
11  need for a hearing, you can find that Mr. Marcus' claims now
12  are simply not credible.
13        It's obviously an incredibly high standard.  We don't
14  think they've met it.  and If you have any further questions,
15  we would otherwise rest on your briefs.
16        THE COURT:  Thank you.
17        Ms. Cohen.
18        MS. COHEN:  Your Honor, may I just address that for a
19  moment?  I do think there's another way of looking at that in
20  that it does in some way confirm Mr. Marcus' affidavit that he,
21  in fact, was the true perpetrator, because I think their
22  thinking was they would go to trial, Mr. DiTomasso would go to
23  trial, and if he was acquitted, then fine, Mr. Marcus didn't
24  have to get on the stand and admit his culpability.  But once
25  Mr. -- if Mr. DiTomasso got convicted, then Mr. Marcus, the

1  true perpetrator, would come forward, as happened in the
2  Central Park case. So I think that cuts both ways. I think
3  that that also can confirm exactly what Mr. Marcus says in his
4  affidavit.
5      I would just also point out, your Honor, there are a
6  few moments in a career when you can put the real perpetrator
7  on the stand. I can't imagine, as a trial attorney, a more
8  valuable piece of information or testimony to add to a trial
9  than someone else testifying they perpetrated the crime. So
10 it's difficult -- it is an incredibly high standard, and I
11 think a difficult standard in that I don't know that any of us
12 can say for sure what would have changed the outcome of this
13 trial, but I do think, of all the possible evidence that could
14 be introduced at a trial, the fact that someone else
15 perpetrated it and takes the stand and says that is probably
16 the most valuable piece.
17     MS. GRAHAM: Your Honor, if you would just indulge me
18 for one more statement --
19     THE COURT: I'll indulge you for one more.
20     MS. GRAHAM: -- since you didn't have to sit through
21 the whole trial --
22     THE COURT: I read the entire transcript.
23     MS. GRAHAM: Okay. Excellent.
24     In Exhibit F, which we've put before you, the May 30
25 call, at the very end, Frankie makes a comment which addresses

1  this entire issue of the idea that Mr. Marcus was wanting to
2  come forward and testify.
3      He's discussing the mistrial motion with Mr. Marcus.
4  And again, it's Exhibit F.  At the very end he says, "The judge
5  will likely not grant it, and even if she does, "I hope you
6  don't try to pull what you did last time, you know, and, well,
7  we can see what happens with that because I'm only doing this
8  to get a new lawyer, to get more time to try to bring to light
9  what -- you know, what should have happened before this trial,
10 but I'll talk to you more about this Wednesday," which is
11 presumably an in-person meeting, showing, again, that
12 Mr. Marcus was in no way prepared to testify before trial.  And
13 even May 30th, after the guilty conviction has come in, Frankie
14 is still concerned that he might again try to delay and
15 ultimately not testify.
16     THE COURT:  Okay.  I'm prepared to rule orally.
17     The defendant has moved, pursuant to Rule 33, for a
18 new trial, arguing that he was deprived of effective assistance
19 of counsel because his trial counsel, Lee Ginsberg, had no
20 trial strategy.
21     Defendant asserts that lack of strategy resulted in
22 Mr. Ginsberg's failure to call as the witness "the one person
23 who could not only confirm Mr. DiTomasso's testimony, but who
24 could exonerate DiTomasso".
25     Defendant's argument has essentially two elements;

1   Mr. Ginsberg lacked a coherent strategy generally, and
2   specifically he failed to call as a witness DiTomasso's uncle,
3   Robert Marcus, who had allegedly previously told Mr. Ginsberg
4   that he, and not the defendant, was responsible for these
5   crimes.
6            The Court finds that neither argument satisfies the
7   extraordinary circumstances necessary for the Court to vacate
8   the conviction and to order a new trial.
9            Starting with whether Mr. Ginsberg had a trial
10  strategy.  The Court has reviewed the trial transcript and does
11  not agree with defendant's argument that there was no
12  discernible strategy.  Defense counsel was faced with an
13  overwhelming amount of evidence that pointed straight at the
14  defendant.  It was a rational strategy to focus attention on
15  trying to persuade the jury that the government's evidence was
16  not sufficient to prove defendant guilty of the more serious
17  production charge.  To have any hope of prevailing, it was
18  critical that defense counsel maintain his credibility with the
19  jury.  To do that, he needed to avoid making arguments that
20  were simply preposterous.  He managed to do that.  Although
21  defendant now complains that Mr. Ginsberg did not cross examine
22  all of the government's witnesses, the Court finds that he made
23  competent, strategic decisions regarding cross examination.
24           To that end, he cross examined the Time Warner
25  employee and established that its records showed a different

1   activation date for the IP address than for the account as a
2   whole -- that's at page 78 to 79 of the transcript -- and that
3   Time Warner does not know who was using the IP address, it can
4   only identify the address at which the IP address was used --
5   that's at transcript 81 and 82.
6          He cross examined several witnesses to establish that
7   there was no evidence that defendant was ever given the user
8   name or password of the victim's Dropbox account, and that
9   certain witnesses could not prove that the account was ever
10  accessed by anyone other than the originator.  See transcript
11  206, 242 to 43, and 620.
12         He did a little damage to the FBI CART examiner by
13  establishing that, although the CART examiner had difficulties
14  fully reconstructing data from the X-Box, he did not make any
15  effort to consult with Microsoft, the manufacturer of the
16  machine.  That was at 343 to 44 of the transcript.
17         Finally, his cross examination of the case agent
18  undercut the implication that the CART examiner had created
19  that CART does a "peer-review" of the forensic work done by the
20  case agent -- that's transcript 603 -- and established that
21  there were attempts to communicate with the victim after
22  February 2nd, but no actual contact -- that's transcript
23  page 617 to 619.
24         While the cross examination was not devastating, it
25  was consistent with the strategy of the focusing on the

1  potential weaknesses of the production charge.

2  That theme continued into the summation with
3  Mr. Ginsberg asking the jury to focus on the fact that the
4  encounters between defendant's IP address and the victim on
5  October 6th and November 28th were live video exchanges that
6  did not result in a recording.  While that is not legally a
7  defense, it was clear that the defense hoped that the jury
8  would insist on there being something tangible to find that
9  production had been actually proven.  As to February 1, he
10 advanced a coherent argument that there was no evidence that
11 defendant encouraged the victim to create the video that was
12 uploaded that day.

13 Although the defendant complains about language in the
14 defense summation telling the jury that, even if they did not
15 believe defendant's testimony, they still had to hold the
16 government to its proof, the Court finds that argument was a
17 reasonable strategy.  Defendant's testimony was close to
18 laughable.  Under those circumstances, it was rational for
19 Mr. Ginsberg to keep the jury focused on the government's
20 burden of proof rather than to attempt to cobble together
21 arguments based on what was obviously perjured testimony.

22 In short, although Mr. Ginsberg did not launch a
23 successful defense, given what he had to work with, including
24 his client's unwise decision to testify, it was a coherent
25 strategy.  It was far from ineffective assistance.

As to the failure to call Mr. Marcus, the Court starts with the fact that an attorney's decision not to call a particular witness for tactical reasons does not satisfy the standard for ineffective assistance. United States versus Eyman, 313 F.3d 741 at 743. It's a 2d Cir. 2002 decision.

Thus, even if all of the facts were as defendant asserts and Mr. Marcus had told Mr. Ginsberg that he was the guilty party and that his nephew was entirely innocent, the decision not to call Marcus would not establish ineffective assistance.

In this case, though, there is substantial reason to question that those facts are accurate. First, Mr. Ginsberg, as an officer of the court, denies that Marcus told him that he, not the defendant, was the guilty party.

Second, the undisputed facts tend to confirm that neither Mr. Ginsberg nor Mr. DiTomasso believed that Marcus was a potential witness. The jail conversation between DiTomasso and Marcus confirms that defendant wanted to pursue a strategy of pointing the finger at his uncle, not that his uncle was prepared to state under oath that he had engaged in a very elaborate job of framing his nephew, but was now ready to testify and confess to the crimes.

Further, it is undisputable that Mr. DiTomasso raised many issues regarding his defense directly with Judge Scheindlin, but when it came time to discuss whether there

1   would be a defense case, he did not mention that his uncle had
2   confessed to his attorney and should be called as a witness.
3   To the contrary, he made clear that he, the defendant, was the
4   only potential witness in his behalf.
5        Further undercutting defendant's argument, his post
6   trial letter which kicked off the subsequent motion by his new
7   attorney did not raise this as an issue.  Instead, the
8   defendant focused entirely on his view that an X-Box cannot do
9   the things the trial witnesses said it did.  That was the issue
10  that he believed deprived him of a fair trial, not his current
11  claim that his lawyer was inept because he failed to call his
12  attorney as a witness.
13       In short, the defendant's motion for a new trial is
14  denied.
15       Ms. Cohen, how long do you want to get ready for
16  sentence?
17       MS. COHEN:  Your Honor, I know that Mr. DiTomasso at
18  one point had been interviewed by --
19       THE COURT:  We have a presentence report and a
20  psychosexual report.
21       MS. COHEN:  That was my question.  I hadn't received
22  any of those, so I will, I guess, manage to get them.  Does the
23  government have them?
24       MS. GRAHAM:  I think so, yes.  We can send them to
25  you.

1     MS. COHEN:  A month, your Honor?
2     THE COURT:  Okay.  If you don't have the report yet, I
3  will give you a month.  Today is the 21st, right?
4     MS. GRAHAM:  Yes, your Honor.
5     THE COURT:  So can you be ready May 19th, with
6  submissions due on May 12th?
7     MS. COHEN:  Yes, Judge.
8     THE COURT:  Okay.  So do we have a time on May 19th,
9  Mr. Brantley?
10    THE DEPUTY CLERK:  3:30.
11    THE COURT:  3:30 on the 19th?
12    MS. COHEN:  Yes, that's fine.
13    THE COURT:  I see nods all around.  Okay.  I will see
14 you all on May 19th at 3:30.
15    Anything further from the government?
16    MS. GRAHAM:  Nothing from the government, your Honor.
17    THE COURT:  Ms. Cohen, anything from you?
18    MS. COHEN:  No, your Honor.
19    THE COURT:  All right.  Thank you all.
20    (Adjourned)
21
22
23
24
25